**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *250 Shoup Mill, L.L.C. v. Testa,* Slip Opinion No. 2016-Ohio-5012.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5012

250 SHOUP MILL, L.L.C. , APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *250 Shoup Mill, L.L.C. v. Testa,* Slip Opinion No. 2016-Ohio-5012.]

*Taxation—Real property—"Public schoolhouse" exemption—Former R.C. 5709.07(A)(1) —Exclusive-charitable-use exemption—R.C. 5709.12(B) and 5709.121—Taxpayer-lessor cannot claim vicarious exemption based on nature of activities of lessee community school—Record shows evidence of view to profit in form of surpluses realized through leases—Denial of claims for exemption affirmed.*

(No. 2015-0340—Submitted April 19, 2016—Decided July 20, 2016.)

APPEAL from the Board of Tax Appeals, No. 2011-2226.

_____

**O'NEILL, J.**

{¶ 1} The appellant property owner, 250 Shoup Mill, L.L.C. ("Shoup"), applied to exempt real property used as a public "community school" for tax year

2010. Shoup challenges a decision of the Board of Tax Appeals ("BTA") that affirmed the tax commissioner's denial of exemption to the property that Shoup leased to the community school. Shoup itself is wholly owned by a 501(c)(3) nonprofit corporation whose members include the very community school to whom the property is leased. Shoup argues that the nonprofit and charitable character of the ownership arrangement decisively distinguishes this case from *Anderson-Maltbie v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, and that that arrangement should qualify the property for exemption under the public-schoolhouse exemption in former R.C. 5709.07(A)(1). Shoup additionally claims exemption for exclusive charitable use under R.C. 5709.12(B) and 5709.121.

{¶ 2} Both the tax commissioner and the BTA rejected the exemption claims primarily on the grounds that the record showed a "view to profit" on the part of the lessor. The gravamen of Shoup's argument on appeal is based on the financial arrangement involving Shoup, New Plan Learning, Inc., and the various community schools supported by New Plan who have similar leases on other properties. Under this arrangement, any excess of rental income is used to subsidize the operations of those community schools. Thus, the argument goes, Shoup and New Plan, the sole member of its L.L.C., are nonprofit entities that function as nothing more than instrumentalities of the community schools that they serve. Because the income realized by Shoup and New Plan consists of nothing but payments from the very community schools on whose behalf those funds are expended, or to whom they are later distributed, this scheme does not involve a "view to profit." Through its corporate affiliation and financial interconnection with the community school, Shoup seeks to derive a tax benefit from the public educational nature of its lessee.

{¶ 3} To accept this argument would require us to view the landlord as an adjunct of the community-school tenant. The argument thereby runs into an insuperable legal barrier: the case law that bars a claim of "vicarious exemption,"

meaning that the property owner's entitlement to the exemption must be judged by its own activities, and not by the activities engaged in by the lessee of the property. Under our case law, Shoup is a lessor and nothing more and must be judged on the basis of that activity alone.

{¶ 4} Although Shoup contends that the surpluses realized through the leases should not be viewed as profit and that no intent to profit has been shown, the BTA, in light of the record that is now before us, found that a view to profit was indeed in evidence. Because the findings of fact lie within the BTA's discretion, and because the record contains sufficient support for its view-to-profit finding, we affirm the decision of the BTA.

### THE PUBLIC-SCHOOLHOUSE AND EXCLUSIVE-CHARITABLE-USE EXEMPTIONS

{¶ 5} The first statute at issue here is former R.C. 5709.07(A)(1), which provided as follows:

> (A) The following property shall be exempt from taxation:
> (1) Public schoolhouses, the books and furniture in them, and the ground attached to them necessary for the proper occupancy, use, and enjoyment of the schoolhouses, and not leased or otherwise used with a view to profit.

2006 Am.Sub.S.B. No. 66, 151 Ohio Laws, Part II, 2868, and Part III, 4397. "Public schoolhouses" was undefined.

{¶ 6} In 2011, the General Assembly amended the exemption extensively. Am.Sub.H.B. No. 153, 129th General Assembly. The amendment (1) eliminated the phrase "public schoolhouses," opting instead for language exempting "[r]eal property used by a school for primary or secondary education purposes," R.C. 5709.07(A)(1), (2) defined "school" as a public or nonpublic school and explicitly included community schools in the definition of "public school," R.C.

5709.07(A)(1)(a) and (b), and (3) eliminated the reference to a "view to profit." But the new language was not in effect for tax year 2010, which is the tax year before the court in this appeal.

{¶ 7} Shoup also claims entitlement to the expanded scope of exemption for exclusive charitable use of the property under R.C. 5709.12(B) and 5709.121. Whereas R.C. 5709.12(B) provides exemption for property "belonging to institutions that is used exclusively for charitable purposes," R.C. 5709.121(A) provides a broader scope of exemption when the property owner qualifies as a charitable or educational institution.

### FACTUAL BACKGROUND

*The property's ownership and use*

{¶ 8} The property at issue is a 41,000-square-foot building located on a 3.7-acre parcel, which was acquired and renovated for use as the Horizon Science Academy-Dayton High School, Inc., an Ohio community (i.e., charter) school. Under a routine arrangement for the Horizon schools, the property is owned by a nonprofit L.L.C. named after the street address: 250 Shoup Mill, L.L.C., in this instance. Shoup itself had a single member, New Plan, which itself is a nonprofit, 501(c)(3) qualified corporation. Shoup qualified as a "disregarded entity" for purposes of federal taxation. *See* 26 C.F.R. 301.7701-2(c)(2). As a result, Shoup did not separately obtain 501(c)(3) status or file separate IRS returns from the sole member, New Plan; instead, Shoup's activity as lessor appeared on the Form 990 tax returns for exempt organizations filed by New Plan as activity of New Plan itself.

{¶ 9} The community school itself is also a nonprofit 501(c)(3) entity. It, along with the other community schools who are tenants of L.L.C.s similar to Shoup, control New Plan as its directors. Thus, the community school/tenants and their landlords are part of a nonprofit, 501(c)(3) "loop" whereby the landlords provide real estate services on behalf of the community schools. Those services

4

include identifying sites for the community schools, qualifying and arranging for construction or renovation loans for the projected schools, and collecting rent in amounts sufficient to make loan payments.

{¶ 10} New Plan's president explained the arrangement as follows:

> We are forming a new charter school. A charter school gets their authorization from the sponsor authorizer. This is a brand new entity. It does not have any track record, no financial history, no operating history, and no money. They go out on the field and they need this facility.
>
> * * *
>
> If they go and talk to the banks, lenders, financial institutions, they ask for three years' of tax returns. They ask for a down payment. The school doesn't have neither [sic].
>
> * * *
>
> * * * They need somebody to help them out. New Plan Learning is an organization. It is controlled by—the charter school tenants comes [sic] into play here.

{¶ 11} In seeking out facilities for a projected community school, New Plan would arrange for loans and supervise construction. It would enter into a lease under which the rent was computed to cover the real estate costs, particularly of paying the loan with a surplus amount, the debt coverage ratio, demanded by the lender. The rent was set at the minimum possible amount. If a tenant school ran into financial difficulty, New Plan deferred rent payments. No tenant was ever notified of past-due rent, hit with a late charge, or evicted for nonpayment. The contrary is true: New Plan would provide affirmative assistance during a troubled

period. New Plan would defer rent or even write it off; in one instance, New Plan made a cash donation to help with financial difficulties.

{¶ 12} The lease between Shoup and Horizon Science Academy-Dayton High School, Inc., has a ten-year term with options for three five-year renewals. It provides for a base rent of $33,806.25 per month, with a 3 percent escalation per year. It has typical commercial lease terms such as fees for late payments and payment-default provisions.

{¶ 13} The record contains financial statements as well. The "gross rental income" of New Plan (from all six properties leased to community schools) for fiscal 2011 was $2,921,965. The tax commissioner asserts a surplus of $150,412 for Shoup for 2011, but a review of the financial statement indicates that the number is a sum of certain expense amounts, not a net surplus figure.

{¶ 14} The balance sheet indicates a modest surplus overall. The revenue/expense statement for fiscal year 2010 showed an upward "change in net assets" of $168,119, while the 2011 statement showed an upward change of $342,402. Those numbers relate to *all* of New Plan's holdings of community-school properties, a total of six properties with a total land value in 2011 of $3,100,288 and a total building value of $19,004,889. The financial statements show modest salary expenses for New Plan's employees: a total for fiscal 2010 of $64,980 and for 2011 of $114,432. For tax year 2011 (New Plan's fiscal year 2012), the Form 990 tax return shows that New Plan's president's salary was $80,833.

*Tax commissioner proceedings*

{¶ 15} Shoup filed its application for exemption on December 10, 2010, seeking exemption with regard to school use beginning August 31, 2009. The application cited R.C. 5709.121 as the proposed basis for exemption, but the tax commissioner's final determination considered not only a charitable-use exemption but also a public-schoolhouse exemption under former R.C. 5709.07(A)(1). As for

6

the charitable-use exemption, the commissioner rejected the claim based on his finding that the property was used "with a view to profit through leasing at a substantial rent," and the property owner could not itself be deemed a "charitable institution" for purposes of applying R.C. 5709.121. By the same token, Shoup could not qualify the property for exemption as a public schoolhouse under former R.C. 5709.07(A)(1) because, under the holding of *Anderson/Maltbie*, the fact that Shoup, "though nominally nonprofit, is primarily acting as a landlord collecting substantial market-rate rent" defeated the claim for exemption.

*The BTA proceedings*

{¶ 16} Shoup appealed to the BTA. The BTA held a hearing in conjunction with two other hearings in related cases involving properties leased to Horizon community schools. At the hearing, Shoup presented the testimony of New Plan's president along with numerous exhibits.

{¶ 17} In its January 27, 2015 decision, the BTA agreed with the commissioner and rejected the charitable and public-schoolhouse claims of exemption. The BTA first rejected the claim of charitable exemption, finding that leasing to a charitable institution did not constitute a charitable use by the property owner. BTA No. 2011-2226, 2015 WL 731766, *2 (Jan. 27, 2015). Next, the BTA rejected the claim that Shoup could qualify as an "educational institution" based on the activities of the lessee, the community school that conducted its educational activity on the property. *Id.*

{¶ 18} Finally, the BTA sustained the tax commissioner's rejection of the public-schoolhouse exemption claim on the grounds that the schoolhouse property was leased with a view to profit. Although the BTA acknowledged the testimony of New Plan's president that, in the BTA"s words, "the property is leased at a rate expected to cover the mortgage payments, construction costs, soft costs, debt service coverage ratio, and operating expenses," the BTA nonetheless found that New Plan "does profit from its leases." *Id.* at *1, 3. The BTA stated that "[w]hile

[New Plan] appears to use the profits to subsidize the operations of other tenant charter schools, it is not the use of any profits that determines the exempt status of the subject properties." *Id*. at *3, citing *Hubbard Press v. Tracy*, 67 Ohio St.3d 564, 566, 621 N.E.2d 396 (1993). The board found it significant that "[i]t does not appear that any excess revenues from a single charter school are held for the future benefit of that certain school," but rather that "excess revenues are distributed among all of New Plan's tenant schools," with the result that the property's use was "with a view to profit." *Id*. For these reasons, the BTA concurred in denying exemption under former R.C. 5709.07(A)(1).

### STANDARD OF REVIEW

{¶ 19} In reviewing a decision of the BTA, we do not sit as "a super BTA or a trier of fact de novo." *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 17, citing *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision*, 66 Ohio St.2d 398, 400, 422 N.E.2d 846 (1981). "The BTA is responsible for determining factual issues and, if the record contains reliable and probative support for [the BTA's] determinations," we will affirm them. *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995).

### A VIEW TO PROFIT DEFEATS A CLAIM OF EXEMPTION UNDER THE PUBLIC-SCHOOLHOUSE AND CHARITABLE-USE PROVISIONS

{¶ 20} As a matter of law, the existence of a "view to profit" in leasing the property to the community schools defeats Shoup's claim for exemption under any of its alternative theories. First, a "view to profit" in the lease defeats the public-schoolhouse exemption under the express terms of former R.C. 5709.07(A)(1). *Anderson/Maltbie*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547. Second, a "view to profit" in connection with the lease forecloses any claim that Shoup's property use can qualify as an exclusive charitable use directly under R.C. 5709.12(B). *Benjamin Rose Inst. v. Myers*, 92 Ohio St. 252, 110 N.E. 924 (1915),

syllabus (real estate belonging to a charitable institution that is "rented for commercial and residence purposes" is not exempt, although the income arising from such use is devoted wholly to the purpose of the charity"); *Northeast Ohio Psych. Inst. v. Levin*, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 15-16. Third, if Shoup cannot demonstrate that its own use of the property as lessor is charitable, it cannot qualify as a "charitable institution" under R.C. 5709.121 because the ownership and leasing of the property is Shoup's only activity. *See Northeast Ohio Psych.* at ¶ 14; *Rural Health Collaborative of S. Ohio, Inc. v. Testa*, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 23 ("The determination whether a property owner qualifies as a charitable institution under R.C. 5709.121 requires examination of the 'core activity' of the institution and determining whether that activity qualifies as charitable for property-tax purposes").

{¶ 21} In a case like the present one, we consider the BTA's finding of a view to profit "primarily a determination of fact that merits our deference." *Cuyahoga Cty. v. Testa*, 145 Ohio St.3d 157, 2016-Ohio-134, 47 N.E.3d 814, ¶ 32. The BTA acknowledged the testimony of New Plan's president that rent amounts were calculated to cover expenses, but a cursory review of the financial statements confirms that the rent at the Shoup Mill location, and presumably the other locations as well, exceeded the monthly expenses associated with the property.

{¶ 22} Specifically, the financial statements in the record reveal that Shoup Mill was the payor on a 25-year note for a principal amount of $3,375,000 and that the monthly rent for the Shoup property started at $33,806.25 and amounted during fiscal year 2011 to $34,651.42 per month. For fiscal year 2011, the monthly mortgage-loan payment was $22,979. Even if we assume a debt-service coverage requirement imposed by the lender of 1.2 percent, the total mortgage-loan-related expense per month is no more than 80 percent of the rent amount. Although New Plan incurred additional expenses, the allocation of such expenses to the Shoup Mill

property on a monthly basis adds at most a few thousand dollars to the expense side of the ledger; the rent amount still substantially exceeds those expenses. Moreover, the financial statements indicate a steady increase in "net assets" from year to year for New Plan.

{¶ 23} It is well settled that in the context of a claim for charitable exemption, profit is defined as the excess of price over cost. *Am. Soc. for Metals v. Limbach*, 59 Ohio St.3d 38, 40, 569 N.E.2d 1065 (1991); *see also Seven Hills Schools v. Kinney*, 28 Ohio St.3d 186, 187-188, 503 N.E.2d 163 (1986), quoting *Webster's New International Dictionary* 1976 (2d Ed.1960) (profit is the " 'excess of income over expenditure, as in a business or any of its departments, during a given period of time' "). This case law plainly construes as "profit" the revenue generated by a nonprofit entity from one activity in order to fund another, distinctly charitable, activity.

{¶ 24} Given that it was Shoup's burden to prove its entitlement to an exemption, *Newman v. Levin,* 120 Ohio St.3d 127, 2008-Ohio-5202, 896 N.E.2d 995, ¶ 30, the BTA was justified in requiring Shoup to show with specificity that the rent did not typically generate a surplus over expenses. And it was neither unreasonable nor unlawful for the BTA to find a view to profit under these circumstances.

{¶ 25} A finding of a view to profit in this case is consistent with this court's decision in *Anderson/Maltbie*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547. "If the lease is intended to generate profit for the lessor, the property does not qualify for exemption; similarly, the property does not qualify for exemption if the lessee's use is intended to generate profit." *Id.* at ¶ 33. It follows that in applying the public-schoolhouse exemption, the BTA properly looked at whether the lessor conducted its operations with a view to profit as a separate issue from whether the community school itself did so.

**{¶ 26}** Our analysis receives support from the case law that bars a claim of "vicarious exemption," meaning that the applicant for exemption must prove that *its own activities* qualify as exempt; it may not rely upon the activities of its customers or, as here, its lessees. *See OCLC Online Computer Library Ctr., Inc. v. Kinney*, 11 Ohio St.3d 198, 200-201, 464 N.E.2d 572 (1984), citing *Joint Hosp. Servs. v. Lindley*, 52 Ohio St.2d 153, 370 N.E.2d 474 (1977).

**{¶ 27}** In *OCLC*, the applicant sought to exempt its real estate, relying in part upon the assertion that its fee-paying customers were public libraries that benefited from the purchase of its services, which in turn benefited the general public. We rejected the argument on the grounds that it "simply constitutes an attempt by OCLC to obtain a vicarious charitable exemption by virtue of the activities of its customers." *Id.* at 200.

**{¶ 28}** In *Joint Hosp. Servs.*, we addressed a claim for a sales-tax charitable exemption in which several nonprofit hospitals pooled their resources to create a separate nonprofit entity that provided laundry and linen service for the hospitals and several other nonprofit charitable organizations, such as nursing homes. The jointly controlled entity sought exemption for its own purchases on the theory that it qualified as a nonprofit operated exclusively for charitable purposes on account of "its relationship to the health care functions of the institutions it serves," that relationship being "so immediate, intertwined and necessary, that it effectively engages in the alleviation of illness, disease, or injury." 52 Ohio St.2d at 155, 370 N.E.2d 474. We rejected the claim, holding that "[a]ppellant's own functions fail the [charitable purpose] test" inasmuch as the "laundry and linen service in itself neither improves health through alleviating illness, disease or injury, nor constitutes managing a home for the aged." *Id.*

**{¶ 29}** The resemblance of *Joint Hosp. Servs.* to Shoup's claim is indisputable; here, the community schools in some sense pool their resources so that excess revenues may be used by New Plan to subsidize all of its tenant schools.

Under *OCLC* and *Joint Hosp. Servs.,* however, Shoup cannot qualify as charitable based on New Plan's activities, and under *Anderson/Maltbie*, Shoup cannot qualify for public-schoolhouse exemption so long as it is operated with a view to profit.

{¶ 30} Shoup also argues that any surpluses attained through the leases do not establish the Shoup Mill property as being held with a "view to profit," because the rent is held to a minimum level. But as discussed, the BTA plainly exercised its discretion as the finder of fact and found Shoup's proof insufficient.

{¶ 31} Nor can Shoup salvage its claim by drawing the distinction between an "intent to profit" on the one hand and surpluses that occur "unexpectedly and fortuitously" on the other hand. Despite Shoup's statements disclaiming an intent to profit, the BTA is entitled to draw reasonable inferences from the evidence before it, and we will reverse its findings of fact "only when there is a total absence of evidence to support a particular finding." *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 14. As we have noted, the record before us contains evidence of a view to profit. Shoup lays great store by New Plan's ability and willingness to grant rent deferral or rent forgiveness to the community schools, but in the end its ability to do so depends upon the very excess of revenue over expense that, as profit, disqualifies it from exemption.

{¶ 32} The same body of case law leads us to reject the claim that Shoup may qualify as an "educational institution" for purposes of availing itself of the expanded scope of charitable-use exemption under R.C. 5709.121. Quite simply, Shoup itself is a lessor and does not engage in educational activity. The prohibition of "vicarious exemptions" bars Shoup from relying on the activities of its lessee as a basis for claiming an exemption of its own.

{¶ 33} Finally, the ownership of the property will vest, after the acquisition and renovation loans are paid off, the mortgages released, and the leases have expired, in New Plan and Shoup, its L.L.C., rather than in the community school

itself. This fact also supports the BTA's finding of a view to profit in the lease transaction.

### CONCLUSION

**{¶ 34}** For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER and LANZINGER, JJ., concur.

O'DONNELL, J., dissents in an opinion.

KENNEDY, J., dissents in an opinion that O'DONNELL and FRENCH, JJ., join.

_____

**O'DONNELL, J., dissenting.**

**{¶ 35}** Respectfully, I dissent.

**{¶ 36}** I would reverse the decision of the Board of Tax Appeals because it errantly denied the public schoolhouse exemption because the property was not leased with a view to profit.

_____

**KENNEDY, J., dissenting.**

**{¶ 37}** I respectfully dissent. Our case law and the record in this matter support a finding that the lease of the property by 250 Shoup Mill, L.L.C., to a community school is not intended to generate a profit and, therefore, is not inconsistent with the public-schoolhouse exemption as discussed by this court in *Anderson/Maltbie Partnership v. Levin,* 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547. Therefore, the Board of Tax Appeals erred in affirming the denial of exemption under the public-schoolhouse exemption, former R.C. 5709.07(A)(1). 2005 Am.Sub.H.B. No. 66, 151 Ohio Laws, Part II, 2868, and Part III, 4397. Moreover, the majority is improperly extending case law regarding the so-called "vicarious exemption" in the realm of charitable use to the public-schoolhouse exemption without support in our precedents. Accordingly, I would conclude that

the property is entitled to exemption under the public-schoolhouse exemption under former R.C. 5709.07(A)(1) and reverse.

**{¶ 38}** In reviewing a BTA decision, this court considers whether the decision was "reasonable and lawful." R.C. 5717.04. Under this standard, we acknowledge that " '[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,' " we will affirm them. (Brackets sic.) *Satullo v. Wilkins,* 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). On the other hand, we " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " *Id.*, quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001).

**{¶ 39}** Contrary to the majority's assertion, the BTA's decision was not "reasonable and lawful." While findings of fact lie within the BTA's discretion, we are not to blindly rubberstamp them. Instead, we are to ensure that the record contains reliable and probative support for the BTA determinations. Here, the record does not support the BTA's factual findings, and its determination was based on an incorrect legal conclusion.

**{¶ 40}** In *Anderson/Maltbie,* we stated that "property 'appropriated to the support of education for the benefit of the public without any view to profit' qualifies for [the public-schoolhouse] exemption." 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, at ¶ 30, quoting *Gerke v. Purcell*, 25 Ohio St. 229, 247 (1874). When the property at issue is subject to a commercial for-profit lease, whether the exemption applies despite the restriction that the property may not be used with a view to profit requires examination of both lessor and lessee. *Id.* at ¶ 33. "If the lease is intended to generate profit for the lessor, the property does not qualify for exemption; similarly, the property does not qualify if the lessee's use is intended to generate profit." *Id.*

**{¶ 41}** Accordingly, in the current matter, the focus is on whether Shoup Mill intended for the lease to generate a profit. The record reveals that it did not, and the fact-finding and legal determinations reaching the contrary conclusion are unreasonable and unlawful.

**{¶ 42}** First, the tax commissioner's finding that Shoup Mill was collecting substantial market-rate rent is devoid of any evidentiary basis. In fact, the president of New Plan Learning, Inc. ("New Plan") answered "no" when asked whether New Plan or Shoup Mill had "scrutinized the market" to determine the rent. Instead, he testified that "we are driven by the school's needs and what the lender is offering."

**{¶ 43}** Second, the BTA's finding that the mere existence of a surplus establishes the intent to realize a profit is a legal error. While the record does support that some net surplus was realized during a couple of years for which documentation was supplied, such surpluses qualify as de minimus; even the majority recognizes it as a "modest surplus." Majority opinion at ¶ 14.

**{¶ 44}** In concluding that the mere fact that any profit is realized qualifies as an intent to generate a profit, the majority disregards our case law in which we have recognized that when the overriding purpose of a property is charitable or public, minor surpluses do not defeat the exemption for charitable and/or public use, particularly when those surpluses merely help finance the very activity that is public or charitable in character. *See Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775, 38 N.E.3d 847, ¶ 24 (minor surplus in fund for city golf course "does not constitute 'profit' that would violate the limitation of R.C. 5709.121(A)(2)"); *South-Western City Schools Bd. of Edn. v. Kinney*, 24 Ohio St.3d 184, 186, 494 N.E.2d 1109 (1986) (renting of apartment on public golf course, operation of pro shop, and operation of snack shop did not violate "view to profit" limitation); *Girl Scouts-Great Trail Council v. Levin*, 113 Ohio St.3d 24, 2007-Ohio-972, 862 N.E.2d 493, ¶ 17-18 (store in Girl Scout headquarters selling scout-related items at slight profit did not violate "view to profit" criterion).

{¶ 45} Instructive here is the discussion in *Girl Scouts* of *Bowers v Akron City Hosp.*, 16 Ohio St.2d 94, 243 N.E.2d 95 (1968), in support of its holding that the mere generation of a profit does not necessarily defeat the claim of exemption. In *Bowers,* a nonprofit charitable hospital owned an adjacent parking lot that charged a fee to help defray the cost of maintaining it; the court held that the generation of a profit by the lot "does not remove it from the statutory category of exempt property" because "the evidence shows that the parking lot is an essential and integral part of the hospital's function and not property used mainly for income purposes." *Bowers* at 96.

{¶ 46} Likewise, the real property acquisition, financing, construction, and management functions that New Plan and its subsidiaries perform for the community schools constitute an "essential and integral part" of the community schools' own operations; accordingly, the surpluses generated through rental income do not violate the "view to profit" criterion for the same reason that similar income did not in the earlier cases. After all, fiscal prudence dictates that New Plan must maintain its own solvency in order to perform its function of developing and managing the real estate assets on behalf of its director/clients.

{¶ 47} Moreover, the majority's reliance on "case law that bars a claim of 'vicarious exemption' " to support the denial of the public-schoolhouse exemption is inappropriate. An examination of the majority's supporting authority reveals that the claims for exemption in those cases were not made under former R.C. 5709.07. In *OCLC Online Computer Library Ctr., Inc. v. Kinney*, 11 Ohio St.3d 198, 199, 464 N.E.2d 572 (1984), the taxpayer abandoned its claim for exemption under R.C. 5709.07 and contested only the BTA's rejection of its claim under R.C. 5709.12. And in *Joint Hosp. Servs., Inc. v. Lindley,* 52 Ohio St.2d 153, 370 N.E.2d 474 (1977), the claim for exemption was made under R.C. 5739.02(B)(12). Both of these cases involved exemptions for charitable institutions, not public schoolhouses, and both involved taxpayers who sought exemptions based upon the

charitable status of their customers. We rejected the claims, finding that the taxpayers were not entitled to a vicarious charitable exemption. In neither *OCLC* nor *Joint Hosp. Servs.* did the taxpayer itself qualify as a charitable organization. *See OCLC* at 201; *Joint Hosp. Servs.* at 155.

{¶ 48} In contrast, former R.C. 5709.07(A)(1) limited the schoolhouse exemption to property "necessary for the proper occupancy, use, and enjoyment of the schoolhouses, and not leased or otherwise used with a view to profit." There is no "used exclusively" language. Instead, the property may not be "used with a view to a profit." In a lease situation such as the one at bar, we are required to examine whether "the lease is intended to generate profit for the lessor." *Anderson/Maltbie,* 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 33. Accordingly, since the focus is on the intention of the lessor, who is the one claiming the exemption, there is no basis for extending the "vicarious exemption" analysis to the public-schoolhouse claim in this case.

{¶ 49} Therefore, I would reverse the BTA's decision and grant the public-schoolhouse exemption. Accordingly, I respectfully dissent.

O'DONNELL and FRENCH, JJ., concur in the foregoing opinion.

_____

Eastman & Smith, Ltd., M. Charles Collins, and Graham A. Blume, for appellant.

Michael DeWine, Attorney General, and Melissa Baldwin and Sophia Hussain, Assistant Attorneys General, for appellee.

_____