[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Breeze, Inc. v. Testa,* Slip Opinion No. 2017-Ohio-7801.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-7801

BREEZE, INC., APPELLANT, *v*. TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Breeze, Inc. v. Testa,* Slip Opinion No. 2017-Ohio-7801.]

*Taxation—Real property—Public-schoolhouse exemption—Former R.C. 5709.07(A)(1)—View to profit—Exclusive-charitable-use exemption—R.C. 5709.12(B) and 5709.121—Decision of Board of Tax Appeals denying tax exemption vacated and cause remanded for further consideration.*

(No. 2015-0341—Submitted February 28, 2017—Decided September 26, 2017.)

APPEAL from the Board of Tax Appeals, No. 2012-2216.

_____

**DEWINE, J.**

{¶ 1} This is an appeal from a decision of the Board of Tax Appeals that denied a tax exemption for real property leased to a community school. Relevant to this appeal are the public-schoolhouse exemption found in former R.C. 5709.07(A)(1), 2005 Am.Sub.H.B. No. 66, 151 Ohio Laws, Part II, 2868, and Part III, 4397, and the charitable-or-public-use exemption in R.C. 5709.12. Under both

statutes, no exemption is available if the property is leased with a "view to profit." Former R.C. 5709.07(A)(1); R.C. 5709.121(A)(2) (defining the scope of R.C. 5709.12). The Board of Tax Appeals ("BTA") affirmed the tax commissioner's denial of an exemption on the sole basis that the school's rental payments exceeded the lessor's expenses under the lease. In the BTA's view, the fact that there was any excess of rental income over expenses required the denial of the exemption. We disagree. The focus should be on the plain meaning of "view to profit"; that is, whether the lease was intended to generate a profit for the lessor. Because the BTA unreasonably ignored evidence of the lessor's intent, we vacate its decision and remand the case to the BTA.

**Background**

{¶ 2} The property owner, Breeze, Inc., is part of a complex arrangement of community schools and related entities. At the head of the arrangement is a nonprofit corporation, New Plan Learning, Inc. ("New Plan"). New Plan is the sole owner of Breeze and other similar entities that hold title to property used by community schools. According to Murat Arabaci, who was Breeze's president and chief financial officer from 2007 to 2009 and who then became New Plan's president and chief financial officer, when a community school receives authorization to operate in an area, New Plan identifies an available facility in the area and works to facilitate the purchase of the facility. The property is then held by one of the title-holding entities, such as Breeze, which, in turn, leases the property to the community school. The title-holding entity—here Breeze—collects rent from the school. The rental income is used to pay the mortgage for the property. Any surplus rental income passes to New Plan for its use in support of all the affiliated community schools.

{¶ 3} In this case, 1.87 acres of real property that included a building that was formerly a furniture store was identified for use as a community school that would become known as Horizon Science Academy–Columbus High School

("Horizon"). The seller of the property wanted to deal only with for-profit entities, so New Plan formed Breeze as a for-profit corporation. Breeze then purchased the property and leased it to Horizon. Eventually, by 2011, Breeze was converted to a nonprofit corporation.

{¶ 4} Breeze sought an exemption for the property for tax year 2011 and remission of taxes it had paid for tax years 2008, 2009, and 2010. Although Breeze's application indicated that it was seeking exemption under both R.C. 5709.07 and 5709.121,[1] the tax commissioner's final determination addressed only R.C. 5709.07. He determined that for tax years 2008 through 2010, because Breeze had collected "substantial market-rate rent," the property was leased "with a view to profit" for purposes of former R.C. 5709.07(A)(1). Thus, Breeze was not entitled to an exemption for those years. For tax year 2011, however, the tax commissioner concluded that Breeze was entitled to an exemption, because R.C. 5709.07(A)(1) had been revised to provide for exemption of property used for educational purposes, regardless of whether there was an intent to profit. *See* 2011 Am.Sub.H.B. No. 153. The tax commissioner's determination as to tax year 2011 is not at issue in this case.

{¶ 5} Breeze appealed to the BTA, which affirmed the denial of the exemption based on the "view to profit" finding. BTA No. 2012-2216, 2015 WL 731788 (Jan. 29, 2015).

**The Statutory Provisions**

{¶ 6} Former R.C. 5709.07(A)(1) provided a tax exemption for "[p]ublic schoolhouses, the books and furniture in them, and the ground attached to them necessary for the proper occupancy, use, and enjoyment of the schoolhouses, and not leased or otherwise used with a view to profit." 151 Ohio Laws, Part III, at

---

[1] Breeze indicated that it was seeking an exemption under R.C. 5709.121, but that statute simply provides definitions for the phrase "used exclusively for charitable or public purposes." The actual source of the charitable-or-public-use exemption is R.C. 5709.12.

4397. Under R.C. 5709.12(B), property "used exclusively for charitable purposes" is exempt from taxation. And R.C. 5709.121(A)(2) provides that real property "belonging to a charitable or educational institution * * * shall be considered as used exclusively for charitable or public purposes by such institution," if the property "is made available under the direction or control of such institution * * * for use in furtherance of or incidental to its charitable, educational, or public purposes and not with the view to profit."

### The Plain Meaning of "With a View to Profit"

{¶ 7} There can be no ambiguity about the meaning of the phrase "with a view to profit." *Merriam-Webster's Collegiate Dictionary* 1394 (11th Ed.2003) defines "with a view to" as "with the object of." *The Oxford English Dictionary* provides this similar definition: "with the aim or object of attaining, effecting, or accomplishing something." 19 *Oxford English Dictionary* 621 (2d Ed.1989).

{¶ 8} We have construed "with a view to profit" in line with the plain meaning of the phrase: "If the lease is *intended* to generate profit for the lessor, the property does not qualify for exemption." (Emphasis added.) *Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 33. Thus, the key inquiry in determining whether property is leased with a view to profit focuses on the aim or intention of the lessor.

### Breeze's Evidence of its Intent

{¶ 9} Breeze maintains that it did not intend to generate a profit with its lease to Horizon. Instead, as Arabaci explained, the amount of the rental payment for a number of community-school properties, including the property at issue in this case, was dictated by the lending bank:

> [The bank] agreed to give us a loan to convert the building into a school use.

4

> They gave us a term sheet commitment letter. We sat down with the school board. We said that these are the terms; this is the interest rate; this is the mortgage; this is the debt service coverage ratio; and according to these offers, * * * if you're accepting this from this bank, this is how much the rent is going to be.
>
> In the end, we compared this rent amount to the school projections and what percent of the school revenue is going to go for the facility. When we did our analysis with the school board, we concluded that the school can afford to pay this interest rent. I have to underline that *we selected the rent at the minimum possible amount*.

(Emphasis added.)

{¶ 10} According to Arabaci, the point was to minimize the rent so the school would "have more money to serve the kids." Consistent with this purpose, the rent payment was adjusted on occasion in light of the school's budgetary needs. Further, when the school was unable to pay, rent was deferred and sometimes written off completely.

**The BTA Unreasonably Ignored Breeze's Evidence**

{¶ 11} Despite the statutes' plain language making both the public-schoolhouse exemption and the charitable-or-public-use exemption hinge on the intent underlying the lease arrangement, neither the tax commissioner nor the BTA appears to have paid much heed to Arabaci's testimony. Instead, the tax commissioner concluded, without explanation, that Breeze had collected "substantial market-rate rent" and so had "clearly" entered the lease with a view to profit. The BTA's focus was slightly different—it concluded that because there was an "excess of rental income over expenses" that was distributed not only to

Horizon but to other charter schools, the lease had been done with a view to profit. 2015 WL 731788 at *2.

{¶ 12} We considered the impact of an excess of rental income over expenses in *250 Shoup Mill, L.L.C. v. Testa*, 147 Ohio St.3d 98, 2016-Ohio-5012, 60 N.E.3d 1254, which involved another title-holding company owned by New Plan. There, we examined the monthly mortgage-loan, debt-service-coverage, and rental-income amounts for the property for the tax year at issue, which was 2010. *Id.* at ¶ 22. We determined that the property-related expenses constituted no more than 80 percent of the rental income for the property during 2010. *Id.* Based on our examination of the record, we concluded that the BTA and the tax commissioner could reasonably have found a view to profit in the leasing arrangement as to tax year 2010. *Id.* at ¶ 23-24.

{¶ 13} As in *Shoup Mill*, the fact that rental income exceeded expenses may have some relevance to the question whether the property was leased with a view to profit. But the overriding focus—as prescribed by the language of the statutes— must be on the intent of the lessor. Evidence of an excess of rental income over expenses is relevant only to the extent that it sheds light on the lessor's intention regarding the lease.

{¶ 14} Here, Arabaci's testimony about the purpose of Breeze's lease to the school was not disputed. His testimony was bolstered by other evidence about Breeze's relationship with the school, including that it adjusted rent to help the school's budget and sometimes deferred or wrote off rent that was due. The BTA, however, ignored this evidence of the lessor's intent.

{¶ 15} We will reverse BTA's decisions that are "unreasonable or unlawful." R.C. 5717.04. It was unreasonable for the BTA to ignore Breeze's evidence of its intent regarding its lease with Horizon and focus solely on the excess of rental income over expenses. Accordingly, we remand the matter so that the BTA can consider the purpose of the lease.

{¶ 16} On remand, we instruct the BTA that although the fact that rental income exceeded expenses is not completely without relevance, that fact should not be given undue significance. Instead, the focus must be on whether Breeze intended to profit from the lease. In making its determination whether there was a "view to profit" in the lease, the BTA must consider Arabaci's undisputed testimony about how the rental-payment amount was established. And the BTA should determine the significance of Breeze's adjusting rental payments and not collecting rent for some of the periods at issue.

**Conclusion**

{¶ 17} To determine whether a property owner leased the property with a view to profit, the inquiry must focus on whether the lessor intended to generate a profit through the lease. Because the BTA unreasonably ignored the evidence of Breeze's intent, we vacate its decision. On remand, the BTA shall consider, as set forth above, whether the property qualifies for exemption under the public-schoolhouse exemption of former R.C. 5709.07(A)(1) as well as under the charitable-or-public-use exemption of R.C. 5709.12, as clarified in R.C. 5709.121.

Decision vacated

and cause remanded.

O'DONNELL, KENNEDY, and FISCHER, JJ., concur.

FRENCH, J., concurs in judgment only.

O'CONNOR, C.J., dissents, with an opinion joined by O'NEILL, J.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 18} The majority opinion vacates the decision of the Board of Tax Appeals ("BTA") and remands the case for the BTA to make findings of fact concerning the purpose of the lease for the property at issue in this case and whether it was made with a "view to profit." Majority opinion at ¶ 1. Because the majority's

decision contravenes our holding in *250 Shoup Mill, L.L.C. v. Testa*, 147 Ohio St.3d 98, 2016-Ohio-5012, 60 N.E.3d 1254, I dissent.

{¶ 19} The majority acknowledges that we have already decided the precise issue herein, the impact of excess rental income over expenses in determining whether a taxpayer had a view to profit, in *Shoup Mill*. But what the majority fails to acknowledge is that it is effectively overruling the standard we established in *Shoup Mill*. Indeed, appellant, Breeze, Inc., noted in its merit brief that "[t]he underlying hearing in this case at the BTA level was conducted at the same session as the hearings in the related cases involving 2350 Morse LLC * * * and 250 Shoup Mill LLC" and "the parties' BTA counsel in both this case and the Shoup Mill appeal specified their intention to incorporate the hearing record from the Morse matter into these respective cases." Yet the majority inexplicably fails to appreciate that it is dealing with substantially the same record as in *Shoup Mill*. It is exactly this record, relevant for purposes here across all three cases (*Shoup Mill*; *2350 Morse, L.L.C. v. Testa*, case No. 2015-0342; and this case), that the majority instructs the BTA to examine to determine whether Breeze had a view to profit from the lease, ordering the BTA to "consider [Murat] Arabaci's undisputed testimony about how the rental-payment amount was established" and "determine the significance of Breeze's adjusting rental payments and not collecting rent for some of the periods at issue." Majority opinion at ¶ 16. This evidence was part of the record before this court in *Shoup Mill*, in which we declared that "[d]espite Shoup's statements disclaiming an intent to profit, the BTA is entitled to draw reasonable inferences from the evidence before it." *Shoup Mill* at ¶ 31.

{¶ 20} In this case, like in *Shoup Mill*, the BTA relied on Breeze's excess of rental income over expenses to find that Breeze had a view to profit. In *Shoup Mill*, we affirmed the BTA's decision "[b]ecause the findings of fact lie within the BTA's discretion, and because the record contains sufficient support for its view-to-profit finding." 147 Ohio St.3d 98, 2016-Ohio-5012, 60 N.E.3d 1254, at ¶ 4.

But the majority chooses to send this case back to the BTA for a closer look and mandates that "the inquiry must focus on whether the lessor intended to generate a profit through the lease," majority opinion at ¶ 17, despite the same record being available in both cases to determine the same legal question.

{¶ 21} In fact, the only additional evidence Breeze produced in this case that is not also applicable to the other two cases is material that offered little to indicate that Breeze did not intend "to generate a profit through the lease," including financial statements, mortgage-related documents, a deed, lease-related documents, articles of incorporation, and other governing documents. The information gleaned from these records does not meet Breeze's burden, under *Shoup Mill*, to establish that Breeze's rental income did not exceed its expenses to the extent necessary to refute the BTA's conclusion.

{¶ 22} And two facts indicated by the additional evidence filed in this case militate in favor of finding that Breeze had a view to profit. First, in a document titled "Notes to Financial Statements for the Years Ended June 30, 2008 and 2007," Breeze admitted that "portions of one owned property were rented to parties who are not exempt from income tax." Second, Breeze, by its own admission, did not achieve federal-tax-exempt status until July 14, 2009 (and as the majority recognizes, Breeze was a for-profit corporation until 2011, majority opinion at ¶ 3). This evidence, which differentiates this case in those respects from *Shoup Mill*, weighs even more heavily in favor of finding that Breeze had a view to profit, at least during the 2008 and 2009 tax years. But instead of applying this court's previously established standard to the taxpayer here, the majority modifies the standard we announced in *Shoup Mill*, thereby applying a more favorable standard to Breeze without explanation.

{¶ 23} The bottom line here is that the majority is overruling *Shoup Mill*'s holding that the BTA is justified in requiring a taxpayer seeking an exemption under R.C. 5709.12(B) and former R.C. 5709.07(A)(1), 2005 Am.Sub.H.B. No. 66, 151

Ohio Laws, Part II, 2868, and Part III, 4397, to "show with specificity that the rent did not typically generate a surplus over expenses." *Shoup Mill* at ¶ 24. In doing so, the majority decides that a surplus of rental income has only "some relevance" and it creates a new standard that requires the focus in determining whether the property was leased with a view to profit to be on the intent of the lessor. Majority opinion at ¶ 13. This departure from the standard set forth in *Shoup Mill* does nothing to promote stability and predictability in our legal system.

**{¶ 24}** To be true to precedent, the only plausible result in this case is to simply apply *Shoup Mill* and find that Breeze failed to meet its burden of establishing that it had no view to profit. I would therefore affirm the BTA's decision that Breeze is not entitled to a tax exemption.

**{¶ 25}** Accordingly, I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Eastman & Smith, Ltd., M. Charles Collins, and Graham A. Bluhm, for appellant.

Michael DeWine, Attorney General, and Sophia Hussain and Melissa Baldwin, Assistant Attorneys General, for appellee.

_____